BEFORE THE SECOND DIVISION, MARCH 15, 1944

**No. 49256.**—Protest 93659–K of Evans Chemetics Corp. (New York).

Tilson, Judge:   This suit against the United States presents for determination the question of the proper classification of certain imported merchandise which was classified as aluminum scrap and duty levied thereon at the rate of 3 cents per pound under paragraph 374 of the act of 1930 and the trade agreement with Canada, T. D. 49752.   The plaintiff claims said merchandise to be properly dutiable at only 7½ percent ad valorem under paragraph 1555 of said act and the trade agreement with the United Kingdom, T. D. 49753, as waste, not specially provided for.

At the trial of the case there was offered and received in evidence an analysis of the merchandise in question which was made by the Government chemist at New York.   Counsel for the plaintiff also offered and there was received in

evidence herein the record in *Whitehall Shipping Co.* v. *United States*, 29 C. C. P. A. 126, and thereupon counsel for the plaintiff rested his case.

Counsel for the defendant then offered the testimony of one witness who stated, in substance, that he was engaged in purchasing all kinds of nonferrous scrap metals for remelting purposes; that from the analysis of the instant merchandise it was not refuse material, but raw material from which his company makes new aluminum; that the merchandise is susceptible of being used for the ordinary purposes of manufacture; that it is merchantable; that this is scrap to use just like any other aluminum scrap, "and we will buy these grindings just as well as any other aluminum scrap, for the purpose of making new aluminum ingots," and that his company sells those ingots to foundries, and they use them the way they would use any other aluminum ingots.

On cross-examination the witness testified that these grindings are either briquetted or put in some other form in which they can be easily fed into a furnace and the regular smelting process takes place; that the assay of the ingots produced by his company varies from 9 to 98½ percent aluminum. The witness admitted that such aluminum could not be used for rolling purposes, but could be used only for casting purposes, and that the ingots sold by his company are aluminum alloy ingots. The witness also explained that his company could not secure enough aluminum grindings to make a full charge into a furnace, and that in order to make a full charge they used various worn-out articles such as automobile crankcases, turnings, and also dross.

If we accept the testimony of the defendant's witness as establishing that the involved merchandise is aluminum alloy, the paragraph under which it was assessed provides for alloy in chief value of aluminum, and there is nothing to show that the involved merchandise is not in chief value of aluminum. The collector so classified it, and there is nothing in this record to overcome the presumption of correctness in favor of such classification.

The analysis of the involved merchandise shows the following:

| | |
|---|---|
| Silicon Carbide | 7. 5% |
| Insoluble Alumns | 2. 1% |
| Copper | 3. 1% |
| Manganese | 0. 2% |
| Zinc | 6. 1% |
| Iron | Trace |
| Aluminum and small impurities | 81. 0% |

In the incorporated case the analysis showed two samples of the merchandise there involved to consist of 66 percent aluminum and 85 percent aluminum, respectively.

In deciding the *Whitehall Shipping Co.* case, *supra*, our appellate court observed:

According to appellant's witness Everett G. McDonough, a chemist in charge of the laboratory and technical developments of Inecto, Inc. (importer of the involved merchandise, appellant being the importer's broker), aluminum grindings are sometimes purchased by the importer in the United States "from people who make pots and pans, for example, and castings. The pots and pans, or any blank form, that has to be finished off, to finish it off they have to grind the material down, and this is the material that is ground off. We buy mostly through junk dealers because one manufacturer is able to have only a limited or a small amount, and the junk dealer buys it from several manufacturers and processes it and then sells it to the machine shops for aluminum grindings." * * *.

\* \* \* \* \* \* \*

Apparently aluminum grindings produced in the United States are the refuse or waste resulting from the grinding of pots, pans, and castings, whereas, according to appellant's witness, McDonough, although he stated that his testimony was hearsay, aluminum grindings produced in London, England (where the involved merchandise was produced), are the refuse material resulting from the

grinding of aluminum castings. Whether the aluminum castings from which, during their manufacture, merchandise similar to that here involved is produced in England are composed of aluminum or of an aluminum alloy does not appear from the evidence of record, nor is there any evidence of record as to whether the pots, pans, and castings from which, during their manufacture, aluminum grindings are produced in the United States are composed of aluminum or of an aluminum alloy.

The witness McDonough testified that the involved merchandise consists of "the sweepings of machine shops and places of that sort"; that it is dirty and has a "lot of grease in it"; and that, as imported, it contained larger pieces of metal than the material which was introduced in evidence (appellant's exhibit 1) as representative of the involved merchandise, and which is granular in form. Whether or not the larger pieces of metal were aluminum, the witness did not state.

\*       \*       \*       \*       \*       \*       \*

The collector having classified the involved merchandise as *aluminum* in crude form, the burden was upon appellant to overcome the presumption of correctness attending the collector's classification by establishing not only that the collector was wrong, but that appellant's contention was right. In other words, the burden was upon appellant to establish that the involved merchandise is a waste, *not specially provided for*, under paragraph 1555, *supra*, rather than *aluminum in crude form* provided for in paragraph 374.

\*       \*       \*       \*       \*       \*       \*

It is clear from the evidence that the merchandise in question is not aluminum in crude form but is, in fact, a refuse, scrap, or waste material. The record, however, fails to overcome the presumption of correctness attending the collector's classification that it is composed wholly or substantially wholly of aluminum.
\*   \*   \*.

Only because of the similarity between the issue raised in the *Whitehall* case, *supra*, and the issue in the instant case, and also because the record in the former case was admitted in evidence in the instant case, have we quoted so freely from the decision in the former case.

It will be observed that in the *Whitehall* case, *supra*, both this court and the appellate court held the evidence sufficient to overcome the presumption of correctness of the classification of the merchandise as aluminum in crude form. This court also held in the *Whitehall* case, *supra*, that the evidence was not sufficient upon which to hold the merchandise dutiable as waste, not specially provided for, under paragraph 1555, as claimed by the plaintiff, and the appellate court specifically held that "the burden was upon appellant to establish that the involved merchandise is a waste, *not specially provided for*, under paragraph 1555, *supra*. \*   \*   \*." The appellate court also held that the evidence established that the merchandise was not aluminum in crude form but was, in fact, a refuse, scrap, or *waste* material.

If the merchandise in the *Whitehall* case, *supra*, was, in fact, a waste, the fact that it was wholly or substantially wholly of aluminum would not appear to be sufficient to exclude it from paragraph 1555, as a waste, not specially provided for, because we find no specific provision in the act for aluminum waste, or waste wholly or substantially wholly of aluminum.

In view of the fact, however, that the evidence does not change the factual situation in this case from what it was in the *Whitehall* case, *supra*, we follow the ruling laid down in that case and overrule all claims for the plaintiff herein. Judgment will be rendered accordingly.

LAWRENCE, J., did not participate.